Ashley Keller on behalf of the Plaintiffs I'd like to start at page 72 of the special record to correct Dr. Poccarelli's consistency opinion. Because I want to show the court concretely how the decision below misstates the relevant evidence 5 times over 4 pages in this example and applies rules of science that real world scientists do not actually apply, 3 times in this example. So let's start at the very first paragraph on page 72. The District Court says... Wait, wait. You want us to follow along? Of course. So let us get... I think the wind-up is worth the pitch. This is page 72 of the District Court's opinion. I'm looking at it in page A1814, but that's the same as what you're looking at. Correct, Your Honor. Okay, thank you. So in that very first paragraph, the District Court tells us that G, 2018, does not report a link between acetaminophen and autism. Respectfully, that is incorrect. It found a 36 to 85 percent increased risk of that. You can find that in the appendix at 2886. Same paragraph. The District Court says that of studies that published an odds ratio, Saunders does not show a link. Respectfully, again, incorrect. Saunders does not publish an odds ratio of any kind. Not positive, not negative, not a null finding. So that's just an objective misstatement of what the study found. You can see that in the appendix at 1842. Proceeding further through the next paragraph onto the next page, I think it's clear that the District Court is weighing G, 2020, for itself. It tells you it's a study that's riddled with flaws and that it is largely irrelevant to the pregnancy context. This is what the G, 2020, authors themselves said about their own study. They said that our findings support previous studies regarding the association between prenatal acetaminophen exposure and childhood neurodevelopmental risk. That's in the appendix at 1843. At the bottom of page 73, the District Court says that Lew, 2016A. OK. That is, relying on the fact that there were some consistent statements with his as if that was enough to make his valid. Now, there's some reading of that same case which could be different, but I'd like you to address that, because for that, I think it's important. For me, it's really the crucial question. Assuming there were some errors by your experts and assuming there were some errors by the court, what do we do? Yeah, that's a fair question, Your Honor. I'd like to take issue with the assumption that Dr. Baccarelli did what you described, but I won't fight the hypothetical to start and I'll just take it as an assumption. I think you have to take the District Court's opinion that she actually wrote. Part of the reason that District Courts have wide discretion to be a gatekeeper and to exercise that discretion to make these sorts of judgment calls is because they're going to lay out their analysis and explain to you why the expert isn't allowed to testify. If you agree with me that the District Court did commit some objective errors that violate your precedent, weighing the relevant studies, the ones that I've just pointed out, which are clear error, the studies just don't say what the District Court reported, and all of those errors are running in one direction against our experts, at a minimum, I would think you would need to remand and instruct the District Court to do the analysis again without those errors in place. So that one thing we can do, according to you, is vacate and remand, not decide the issue, but point out the errors and then say, now consider, and then see under doubtful, substantial discretion, but unlimited, that is given to you whether the experts are in or out. That is one possibility. Is that something basically satisfactory to you? Well, yes, it is one possibility. I would not rob you of your discretion to do that. I would like to be a little greedier and ask you to just reverse and say that these experts are admissible, and to do that, I do need to take on Your Honor's assumption. Because I don't believe that Dr. Baccarelli just cited other independent scientists for the bottom line conclusion he was reaching and said, see, that's good enough. He definitely cited independent scientists. He cites Bower and Creeble's systematic literature review. He cites the consensus statement to support, for example, his opinion on consistency. But that's not all he did. He went through the entire body of relevant evidence. He transparently disclosed all of his search terms and said, here's how I've discovered all of the things I'm going to look at. Does he handle the sibling studies adequately? I believe very respectfully, Your Honor, he absolutely does. He does a 22-page analysis of genetic confounding. He considers Brand-Listewin, which is the first sibling control study. Gustafson, the second sibling control study. But he does — how does he handle the sibling control studies that seem to run against him? There's only one sibling control study that runs against him. It is Gustafson. He candidly acknowledges that Gustafson shows that the result attenuates towards the null. He explains why all sibling control studies tend to understate true risk. You can look at Gustafson herself. She just published a paper last year saying that sibling control studies like this, 30 to 90 percent of the time, the midpoint of that is 60 percent, so more than 50 percent of the time, are going to give you a false null. They're going to take a real association and make it look null. He provides a mathematical explanation for that and says why taking the totality of the evidence, Gustafson, which cuts against him, as well as Brand-Listewin, which supports him, as well as the negative control studies, Yeastrom, Thompson, and Liu, and says the totality of that makes me believe that genetic confounding isn't the most likely explanation. They can cross-examine him on that for sure. I'm not saying that his opinion is intellectually correct, but it's scientific. It's reliable. It's not the sort of thing that an epidemiologist wouldn't do. I apologize. I just, yeah, well, you can continue, of course. Can I just ask you, in terms of what you view the district court's role, what the role of the district court should have been here? Because in looking at your briefs, as far as what is necessary for this kind of testimony to come in, it appears you're suggesting that as long as the expert is qualified and is relying on methodologies that others' studies, peer-reviewed studies, have relied upon and have applied in the way that the expert, the proposed expert, is using them, that that's sufficient for admission of the testimony? And I guess I'm trying to figure out what the boundaries are to that. Like, what would be an example in the context of this type of case of an expert, not an expert who is a qualified expert and who cites the peer-reviewed studies, who the district court could probably say, well, no, actually, this is not reliable? What would make it unreliable? Yeah. I appreciate that question, Your Honor. I hope I can continue to bear my lights on. Yes, of course. I think you're going to be here longer than 10 minutes. I anticipated there was some possibility of that. First, I want to say I think you've correctly stated our rule. We do believe that a gatekeeper judge does not play the starring role in our civil justice system. That is for juries. They get to ultimately decide the factual question of causation. Not necessarily for juries, at least until the other side has also spoken, and at that point it may be so overwhelming that it doesn't go to jury. That is true. We are not trying to alter the Rule 56 standard in any way. But I do think that if an expert in epidemiology points to other epidemiologists outside of the courtroom who do things the same way, who apply their methods and principles the same way, under your colleague's precedent, for example, in City of Ponoma from the Ninth Circuit, that meets our burden of showing reliability. It doesn't mean our experts are right, of course not, on the ultimate question. We haven't met our burden by preponderance on that. They get their vigorous cross-examination. They get all of the things that Daubert talks about. But I do think if we can point to other experts who do their Bradford Hills this way outside of the courtroom, under Kumho-Tyre, that meets their burden of establishing reliability under 702D. And the reason I think that has to be the rule is any other rule requires a district court to play amateur scientist. If other scientists outside of court, for example, do a transdiagnostic Bradford Hill, which is not something that our experts actually use in terms of terminology, but they combine the Bradford Hill analysis for ADHD and autism together, as the Alimany meta-analysis on this very question did, how can a district court acting as a gatekeeper, as opposed to an armed guard, as opposed to St. Peter at the Gates of Heaven, determine that those independent scientists are wrong? I don't see how they can possibly come to that. between what scientists do, which is to engage in an ongoing, open-ended, ever-revisible inquiry into the facts of nature and what happens in a court of law. So whether you want to call it transdiagnostic or multidiagnostic or whatever, the hypothetical question, suppose there were no studies showing an association between ASD and acetaminophen use during pregnancy. Not that there were negative studies, just there weren't any studies of that subject. But there were many studies showing such an association for ADHD. I think I got the initials right, right? Would that be enough for a plaintiff who was asserting that acetaminophen use during pregnancy caused her child's autism? Would that be enough to get to the jury on that? Or would that be admissible to say, we know that other, somewhat similar in various ways, syndromes are associated. So probably the same is true for this one. The honest answer is, I don't know. I'm not a scientist. I think it would depend on what independent scientists say about that question. It is known in the scientific community that autism and ADHD have overlapping etiologies. For example, a biologically plausible mechanism by which independent scientists think both autism and ADHD are caused is oxidative stress, which is what our expert said here. I can't tell you what our experts would have said if the only available studies were with respect to ADHD. That's obviously not the record we have. But you would agree, would you not, that the association for ADHD is much, there are many more studies that are, shall we say, more consistent, if that's an appropriate way, that there's a stronger case on ADHD? I'm not sure that I would characterize it that way, Your Honor. I don't think the studies are more consistent. There are definitely more studies that look at ADHD as a diagnostic endpoint. Our experts, I think, reliably opined that you don't have to confine yourself to studies that have a diagnostic endpoint. It is totally appropriate in the science. But so you are saying that whatever the answer to a judge's question would be, that isn't this case, because in this case. Well, it isn't this case. That's why it's a hypothetical. I tried to answer. Hypothetical in the first instance. I gave you my honest answer. I don't know, because I don't want to play amateur scientist. I am only a lawyer. I am not a Ph.D. in epidemiology. But you are a lawyer who tells us, I think in a footnote, that Professor Baccarelli did separate Bradford Hill analyses as well as the joint one, and you chose to submit only the joint one. No. I don't think that that's what we said in a footnote. So Dr. Baccarelli analyzed the nine causal criteria under Bradford Hill for autism and ADHD together. But he did a separate literature review for the autism studies, the ADHD studies, and the studies that had symptoms of both conditions using questionnaires. He rated those studies, considered their strengths and weaknesses separately, and then he did the Bradford Hill analysis together. So I misread the footnote, then. It does not say that he did a separate Bradford Hill analysis for each. Okay. He did the Bradford Hill nine causal criteria together. He separately did a navigation guide methodology. Yes. And then that's before us. Yes. That is before you. It's an entirely separate methodology for assessing causation. That does do the studies separately based on factors that Dr. Baccarelli set forth a priori. I know you're aware of this from the supplemental authority letter we submitted. That report has now essentially been published and peer-reviewed under Eco-Environmental Health's peer-review process. It's obviously been the subject of a lot of discussion lately. And there are lots of scientists who have weighed in and said, we agree, we don't agree. But no one has said it's junk science. Right. No one said it's unreliable. This raises another question I wanted to ask. You mentioned before that Gustafson has a second, more recent article, which I take it is not before us. That's correct. It's not before the district court. The same is true of the Alkvist study. Right. That was not available at the time even of Dr. Ness's expert report, which I think is chronologically later than Baccarelli's. Yes. That is correct. What are we to do with that, if anything, with the fact that the scientific inquiry marches on while the litigation record is closed? It's not irrevocably closed. Either side could ask to reopen the matter, maybe forever, going back for additional depositions or seeking additional expert reports. But how do we cope with the fact that the real state of the science as of today might differ in some ways from the state of the science at the time of these expert reports? Yeah, completely fair question. Nothing is over until it's res judicata. Right. So I think that both sides do have the opportunity to supplement the record if you have an open case. But I think when reviewing the district court's Daubert decision under 702. We have to review the record that's there. That is correct. That is correct. And Dr. Baccarelli, though he did not have the benefit of the most recent Gustafson paper, did cite a number of papers that the Gustafson paper relies on to explain why sibling control studies mathematically and as a matter of intuition understate true risk. So he went through and weighed the evidence. He's obviously credentialed and trained to do so and explained why, given the totality of everything he saw, he didn't believe genetic confounding was the most likely explanation. Reasonable scientists can certainly disagree with him. You've heard from reasonable scientists in the media, which is not the record in front of you, but let's just stipulate. There are lots of reasonable scientists who think he's wrong and that the association here is confounding. Well, I take it that the among those are the defendants experts, which I think technically I haven't looked at them because I think they are not really before us. That's not part of our issue. Our issue is whether your experts can be admitted, not what the other side has to say. But I take it. I take your point that reasonable scientists do appear to disagree about that, about this issue. But is that how how far does that go? Is it only where what an overwhelming majority of this isn't a vote that we're taking? I agree. Reasonable scientists. I couldn't agree with you more. Again, I would commend to you your colleagues opinion in city of Panama. If a minority of scientists do it the way our experts do, that is enough. Under Rule 702 D, as you say, it's not a majority rules thing. Do 51 percent. But you could get a situation in which your scientists are admissible. And then enough evidence on the other side is so strong that before we get to go to a jury, a court could say it is so overwhelming that summary judgment can be given. But that's not before us. I completely agree. You won't be surprised to hear me say I don't think they'll have any chance of meeting the cell attack standards. But yes, yes, I agree that Rule 56 still applies. And if you say that our experts are admissible, then we go through the Dalbert motions that we filed that were mooted as to their experts. Their experts are admissible. The court can, of course, hear live testimony at that point. And at any point by your own standards, that's I mean, I don't want to predict what's going to happen if you make those Dalbert motions. But you're making it very difficult for yourself as well. I do think that there I won't get into things that are in front of you. I think their experts did some things that really were unreliable based on objective scientific principles that every scientist agrees with. But for the most part, that's not in front of you. Not everyone, because they don't, I take it. And, you know, I mean, this to me is one of the problems with this area. We could set out in a couple of paragraphs the law on which both of both you and your friends on the other side would agree and all judges would agree. And it leaves the district courts with somewhat contradictory and I would say contradictory instructions. But with sort of goalposts, you're not supposed to play scientist, but you are supposed to take a hard look at what the scientists say. And in any given case, the poor district judge has to walk a certain line there. And hopefully we might be able to give some guidance there as to how to walk that line. So if I can come back to something that you said earlier, can it really be the rule that if and I think your brief tends to argue this, if there's one peer reviewed study out there that does it your way, the game is over. And I, you know, I've I've seen peer reviewed articles in my academic life that didn't get somebody tenure because the people in the relevant department thought it was a pretty bad article. Yeah. So I don't know if that's how scientists even operate to say that if there's one peer reviewed article that does something that makes that good legitimate, let alone good science. I understand the thrust of your question. Let me give you a flip answer and then a more complete one. The flip answer is yes, that could be the rule. The more complete answer is as follows. I agree with you that district courts and us poor litigants struggle with the level of generality that comes out of the case law. Right. You have to be a gatekeeper. You can't be an amateur scientist. Those are great to say up here. But what do we do down here? And so this is why I do think it's very important to say an expert is reliable and a plaintiff can meet their burden of showing that their experts are reliable. If they can demonstrate that other people outside of the courtroom, real scientists, do it that way. If they point to one peer reviewed study that says it's okay to do it this way and then the other side comes back with a mountain of peer reviewed studies or a textbook or scientific authority that is beyond reproach saying that article snuck past the peer reviewers. That's not the way to do it. I'd be willing to concede in that circumstance. But I think you'd say that. Would you say that's something that the district court could exclude? Or are you saying that that's the Celotex problem? They're related. They're related. I don't think it's a Rule 56 issue. I think you would be doing it in the context of Rule 702D. But I do think in our civil system it's fair to say we're the ones who want these experts admitted. We have the burden of persuasion and production. The way we can meet our burden of production is by pointing to independent sources and saying this is how scientists do it outside of the courtroom. They then have to join issue and at least point to some scientific authority saying that is not at all how you do it. Maybe you found one peer reviewed study that somehow let this slip through, but that's not reliable. We're not in that situation, though. I'm not trying to fight your hypothetical. But to bring it back here, Dr. Baccarelli is not relying on some one-off stuff here and there. We cite the phone book of scientific authority saying that he did his Bradford Hill methodology reliably. We cite independent sources and now his own peer reviewed navigation guide analysis saying that the navigation guide is used to assess causality robustly. It's the gold standard. And the district court said, no, you can't use the navigation guide to assess causality. What have they come back with? Now that, again, to analogize to Celotex, where's their scientific authority? They don't cite one. They don't cite anything saying, for example, again, that the transdiagnostic Bradford Hill is impermissible. We gave you in our brief a half dozen examples of peer reviewed Bradford Hill analyses that did it the same way. So I think we've more than overcome our burden under 702G, at least of production. And if they can't come back and produce anything of their own, our experts are admissible.  All right. I think we have your questions. Thank you, Your Honors. Hopefully I have some time for a vote. Good afternoon, Your Honors. May it please the Court. Jay Lefkowitz for the appellees. I want to start with Judge Lynch's question, if I may. Could it really be enough to satisfy Daubert if an expert had just one peer reviewed study on their side? I don't think it could. But the plaintiffs don't even have that. No scientist or regulator has ever concluded that acetaminophen causes ADH12 or ASU. Well, that's the conclusion. Correct. That's the conclusion. The way I understood the issue before the Court, and I may misunderstand it, Rule 702 talks about techniques and theories. And what I understood was that the district court said that Dr. Baccarelli applied a reliable methodology, a reliable technique, but did it in an unreliable manner. Is that a fair way of reading what the district court said? I think the district court found, Your Honor, three independent bases for striking the expert. The first was that Dr. Baccarelli – That's not what I asked yet. Okay. We're getting there. Do I understand correctly that the issue is whether Dr. Baccarelli reliably applied what is conceded by both sides to be a scientifically valid technique, namely the Bradford-Hill analysis? Oh, yes. The Bradford-Hill analysis is clearly the correct technique, and the judge found that he didn't apply it reliably for a few reasons. One, he went beyond the limitations of the studies themselves that he relied on. Well, but that's a particularly good example, isn't it? Studies will always say they have limitations because that's the nature of scientific studies. One of the things about an experimental method is that you design your particular study. That's not supposed to determine the answer to what public policy should be. It's designed to answer a limited question in a limited way, and it has qualifications to it. But what the Bradford-Hill analysis is supposed to do, I take it, is to aggregate all of the various studies and come to some meta conclusion. So, correct, Your Honor. So let me give you a concrete example of what the judge was focused on. There's a question. There are a lot of studies out there, and, of course, Dr. Baccarelli was looking at all the studies to try to do his Bradford-Hill analysis to come up with his causation opinion. He looks at a series of studies. Lots of them are based on symptoms. Lots are based on diagnoses. The judge pointed out that Dr. Baccarelli himself, in an article he coauthored in 2019 called Lau, said symptom studies are not nearly as reliable as diagnosis studies. Yes. Right. They may not be as reliable, but does that mean that they can't be taken into account? Does that mean that they don't have anything to say about the subject? Does that mean that it's improper to consider both factors, especially in a world where the diagnosis that we're talking about is a pretty squishy one that is based on symptoms? The diagnosis has changed over time in the DSM, but the symptoms that, you know, if something that didn't used to be called autism spectrum disorder is now called that, but it's got the same symptoms, why isn't that something that can be considered? Because in this case Dr. Baccarelli himself said in his report, I'm discounting a study called TRANS. I'm discounting it because it's a symptom study. It's not as reliable. That was his determination in his expert opinion. It seems to me you're constantly coming back to where you began, which is these people didn't show that there was a causal link. But a causal link cannot be shown. All that matters is that people bring in evidence so that then juries or courts may say this goes one way or the other. It doesn't demonstrate the answer. Let me just tell you one thing. Years ago, my father, who was a doctor, a cardiologist, and smoked two packs of cigarettes a day, I showed him that first study that linked cigarettes and cancer, and he went through the whole thing saying there's this wrong with it, there's that wrong with it. It doesn't demonstrate the answer. And that evening at supper, he said, I'm giving up smoking. And I asked him why, and he said, I don't need to wait for the perfect study. I don't need to wait for it. It's enough for me to want to make that decision. Isn't that the level at which we are supposed to be deciding? I think, Your Honor, that this Court's precedents in Amargianos and most recently in Morena and Daniel Suizo make clear that what the judge has to do at a 702 standard hearing is to figure out whether the experts have a reliable methodology. She's not judging their conclusions, albeit the Supreme Court in Joyner says conclusions and methodology aren't entirely distinct. But what Judge Cote did here was she looked at the methodology. She said, what are the things that Dr. Bacarelli says are most important? Did he, in fact, apply that standard in his analysis? That's the issue. And, for example, we heard about G20. Well, G20 is a study looking for an association with autism. But if you read the study, as the judge did, what it points out is that's a study of cord blood, which only tells you about acetaminophen taken on the day of or the day before the delivery. So she said that is not a reliable method of coming up with a conclusion. Why are we the ones to make that decision? I must admit, I rather thought that G was not terribly helpful for some of the reasons that you point out. But at the same time, when I look at the Bradford Hill analysis, what I see is not something like, I applied a chemical test to this pile of white powder and it's heroin. What this methodology does, it seems to me, is apply a framework for thinking about a problem. And it is a framework that apparently expert epidemiologists all use. Your guys use it as well as their guys, right? And it is riddled with situations in which the epidemiologist applying the methodology is not given a rule. Like consistency. Well, how consistent do they have to be? How many studies do they have to be to pass the consistency test? No answer. No answer. The expert has to make a judgment call. So I'm having trouble understanding why an expert who's applying an accepted methodology that requires judgment calls can be faulted when looking at one body of material. The expert says, well, here are my explanations for my judgment calls. Maybe I can start with I think what's the elephant in the room, which is that when Dr. Baccarelli did his analysis, he treated autism and ADHD essentially together. Together, yes. And in this transdiagnostic approach. And there isn't a single transdiagnostic approach in the literature of these two diseases. Yes, but there are, as your friend points out, half a dozen that he cited, and clearly there are more, transdiagnostic type Bradford Hill analyses for different kinds of problems. The question is, is this one that's susceptible to it? And, by the way, it looks to me as if, again, looking at the squishiness of the diagnosis that we're talking about, we've had situations in which the Diagnostic and Statistical Manual said you can't have both ASD and ADHD, and the Internet said you can. And they do have very similar circumstances, so that now there's ASD with hyperkinetic features, which looks like the two things combined together. So let's look. So why aren't these a very good candidate for a transdiagnostic? I'll explain in the way that the district judged it. She looked at this and said, yes, I recognize that they have cited in their briefs the fact that you could look at vaping and cancers of the mouth, the tongue and the cheek together, because there doesn't seem to be any question about how cancer affects the tongue and the cheek. We all understand that. But the expert that they brought to provide the basis for a transdiagnostic approach, because they didn't have a study that did it for these two diseases, so they brought a Dr. Hollander. And what did Dr. Hollander say from a methodological perspective? He said two critical things. One, there may be overlap in the underlying biology. That's at SPA-132. And then in his deposition, he actually conceded that if acetaminophen is associated with hyperactivity, that doesn't necessarily mean it causes both autism and ADHD. But all that is saying is that there are some joint things which would be wrong. There are some that are clearly connected. And here it is a dubious thing. But how does that justify the court throwing it out on that basis? Isn't that, again, one of the things that then have to be decided on how strong the validity was? I must say, to me, one of the errors I thought the court did was to easily say that these things had to be separate. I think it is very interesting to see them connected and then try to decide what that tells me. Your Honor, I think the judge did exactly what this court directed the judge to do in Morena, which is to take a hard look and to make sure that the expert's methodologies are reliable at every step of the way. So, for example, when the expert, Dr. Baccarelli, specifically says, I'm discounting, as we talked about earlier, studies because of symptoms, that doesn't mean that you and I might not think symptoms are kind of a good way of doing it. But he says they're not as good. I'm discounting it. And with respect to one study in one particular connection, why isn't that the kind of judgment call that all of these experts are making under a methodology which, frankly, if you told me this was the methodology and you didn't tell me that both sides agree that this is the gold standard or the way everybody does it, I would say what kind of nonsense is that? Because, Your Honor, there's no explanation for why he chose the Brand-Lestuin study of siblings over the Gustavson one. No, there is. There was 22 pages of discussion of why one was too small a number, of why the mathematics work out a certain way. Now, that may be right or that may be wrong. I can't do the math. But I'm not sure why that is not – I mean, in other words, it's one thing to say he ignores this and he ignores that and he doesn't take account of the other thing. It's a different thing to say he gives an elaborate explanation of something and the Court disagrees with it. They never even made that argument at the district court. It is – they never made that argument about underpowering the Gustavson study. It wasn't even made at the district court. It was made in one footnote without any explanation in the appellate court. But I think substantively it, as the judge found, it was incoherent. The reason, if I just may, Your Honor, the reason that the Gustavson study had a smaller pool was because they were dealing with children who were 12 and 13-year-olds who actually got a diagnosis, not just based on what parents of a 3- and a 4-year-old said, well, there's some symptoms. So, yes, you had a smaller pool, but it was a more accurate pool, not just based on Gustavson, but based on Baccarelli's own methodology. But that could be – you know, I mean, again, that seems to me to be a perfectly good argument about why the one study should be valued over the other one. But why are – you know, it's fine to say take a hard look, and I also don't think it's very helpful to say and don't be an amateur scientist. I mean, you necessarily – that's the role you're thrust into if you're taking a hard look. But what is the ultimate question, it seems to me, can't be do we think this guy is right or wrong, or is he taking too much liberties with this when he's making a judgment call about that. I don't know how – you know, what it results in is a 250-page opinion on the case. This seems to me a very hard way to run a railroad about having the admissibility issues decided. And it's especially hard for us, then, to come back and say, well, we're going to have to read all of these studies. And believe me, I've read quite a bunch of the underlying studies and the studies that the – the expert opinions of which themselves are hundreds of pages and several hundred pages of the district court's opinion. And I can't tell you to this day what I think is right and wrong about what the experts did. What I can tell you, though, is that it seems to me that Dr. Baccarelli is doing science. He's not doing nonsense, and he's not doing cherry-picking, and he's not coming in with priors and paid to come up with a result. I read that opinion and say, here's a man who has very high qualifications, who is explaining at every step of the way why what he is doing is exactly what other people are doing in the field, even if some would disagree with each or every of the specific steps that he takes. So, Your Honor, I have also now read every single study cited in the literature. You're ahead of me. And I'll take another clear example. Everybody knows two things about Tylenol and the potential association. One is that there's a strong hereditary aspect to it, whether it's 65 or 70 percent, we don't know. The other is there's a big concern about what's called confounding by indication. The reason that some women take a lot of Tylenol is because they have whatever it is that has a genetic predisposition to giving these diseases to their children. Now that seems to me to be extremely speculative. The indication for taking Tylenol is that you have a headache or you have a fever. That does not seem to be — that's different than — that that's something that triggers the genetic component. We don't know what triggers the genetic component. That's part of the problem. But again, Judge Cote was looking at what Dr. Baccarelli said. So Dr. Baccarelli, in his opinion, relies on a study called Baker, Baker 2020, which measured Tylenol in meconium. That's the, you know, the first stool of an infant. And made a conclusion about dose response and made a conclusion about the association. Dr. Baccarelli himself coauthored a review, a study in 2022 called Baker 2022. And the conclusion of Baker 2022, which Baccarelli himself coauthored, said we're not sure about the results of Baker 20 because it doesn't measure confounding by indication. Now, all Judge Cote did was say, look, this is inherently not reliable. It's not reliable at every step of the way. I have heard this back and forth enough. I'd like to ask a different question. Did the court err when it said that dosage studies were wrong when based on number of days? Because that was something the court said that troubled me because it seemed to me that that was a pretty, you know, perfectly fair indication of dosage. So just since I'm looking to see whether there were errors on both sides and then what I do with it, I wish you'd address that. Your Honor, I don't think the judge erred at all with respect to her comment about dose response. Indeed, many of the studies that look at dose response and, in fact, say, well, there is some evidence of a dose response, acknowledge that because they don't know how much of the dose was taken, they cannot speculate as to. Oh, come now. But it is. We may not know how much is taken, but isn't the number of days certainly at least an indication that people can take as to dosage? It's not the answer. You're constantly asking us the answer rather than whether this is something that reasonable people might look at in judging. And the court there seemed to me to be doing just the error that you're doing now. Your Honor, the most recent meta-analysis of all the studies, not a study like Alimany, which is of six symptom studies or five symptom studies and one that has some diagnosis, but Ritchie in 2023, which is a comprehensive meta-analysis of 23 studies, 11 of which were diagnosis, but the others were symptoms, said in its conclusion there have not been enough studies done to even do an analysis of autism, and the results of all of the studies for ADHD are low. You're not answering my question about whether the court erred in refusing to give any weight and saying it was incorrect to do dosage based on days taken. I think the judge was not incorrect. I know you're – I know I'm pushing uphill here, Your Honor, but the judge I don't think was incorrect because she was relying on the statements of many of the scientists in the studies that Baccarelli was relying on. And indeed, Ritchie – On this? Yes, on this point. In fact, the major meta-analysis, Ritchie, of all of these studies specifically says that the dose response is not reliable because it could be confounded by indication. That is a scientific statement in the biggest meta-analysis, and so again – You see, again, the thing that bothers me, I wouldn't be as extreme in criticizing what you're saying, but it seems to me that the dose response issue I would think of this way, and I'd like your comment on that. Of course it would be better to have actual dosage information. Of course the number of days is not the same thing as the quantity of the drug taken. That seems to me to be exactly right. Of course that is something of a limitation on the various studies that use that. But those studies use it because it is the best available proxy, if you're looking retrospectively, as we must. We can't just take a bunch of pregnant women and say, here, we'll divide you up into three groups. One of you take a ton of acetaminophen, one of you take none, one of you take a moderate dose, and then we'll see how many of your kids turn out to be autistic. We can't do that, obviously. What we're doing is we're looking at a population of people with symptoms of or with a diagnosis of autism, children with that, and then looking backwards at the experience that their mothers report. Now, granted, these are limitations on coming to some definitive conclusion about causation. But the FDA, when they regulate the drug or decide what warnings there are to be, a court, when confronting a tort question, you know, we don't get to say, well, let's postpone this case for 20 years while the science goes on. We're hearing from experts who are telling us, doing the best analysis that we can based on the information that we have, based on the way the studies, various studies were conducted, we apply this methodology, a well-accepted methodology, though, again, it seems to me one that is very squishy, very subject to subjective judgments, judgment calls all throughout. And here's what my conclusion is as a scientist about whether it is more likely than not that there's a causal effect. And you know what? It turns out they disagree among themselves. The scientists disagree among themselves. But I'm having trouble understanding why the district court was correct to say that this just is nonsense. This is something that no one should hear who's in a position to make a judgment. It just goes out the window when it seems to me that you have a reputable scientist explaining why each of these judgment calls was made and coming to a certain conclusion, which may turn out to be incorrect. Maybe the people on the other side will prove to be much more persuasive when they're heard from. Your Honor, if I could take you back to the Joyner case, which actually was a case where the district judge was faced with an expert who had relied on four different studies to show that certain type of workplace exposure to PCBs caused a certain type of small lung cell cancer. And the district court went through each of those studies and pointed out that none of the studies reached the conclusion that the expert had reached and that methodologically the expert's jump to something brand new was not methodologically sound. Of course, the Eleventh Circuit reversed. And then the Supreme Court basically reversed the Eleventh Circuit and said, look, conclusions and methodology are not entirely divorced from each other. I'm not saying, to be very clear, that an expert couldn't come up with a novel view, even if that no one in the scientific literature, no one in the peer review literature, no regulator had ever reached such a conclusion, because we're not talking about conclusions. But when nobody else has ever reached this conclusion of causation, it certainly requires a very hard look at the methodology to see what is the expert actually doing with the bits and pieces of all the different studies to come up with this conclusion that nobody else has ever come up with. But at least the focus study had said that there was not causation. No one is saying there is causation, but the focus study had said independently there is a connection. So if this is not even that case, that doesn't mean you're wrong, because the fact that there is some other study doesn't mean that this one is adequately done. But this isn't even the case where there is nothing else, no one else, that has suggested a possible link. Dr. Baccarelli, in this case, not in his academic writing, both before and after, but in this case, his opinion is that there is causation. And, in fact, it's that there's causation for both of these disorders, even though these disorders are very different. Ninety percent of children who have ADHD don't have autism. Sixty-five percent of children who have autism don't have ADHD. Their own expert says, well, they share some symptoms. And, in fact, Dr. Baccarelli didn't even really do a transdiagnostic analysis just of autism and ADHD. He looked at, as he said in his report, all NDDs. So that means he was also looking at the other NDDs. I thought when I looked at it more closely, the all NDDs turned out to be symptoms that looked like symptoms. No, no, if you look in the DSM, there are lots of NDDs. Neurological development disorders, schizophrenia. I understand that. Excuse me, please. I understand that there are multiple NDDs. The question is, what was Dr. Baccarelli looking at? Because I didn't see references to schizophrenia or something like that. I thought that what he was actually focused on turned out to be something a little different than what I thought it was, based on that definition of NDDs. Am I wrong? He was looking at the entire spectrum of ADHD and ASD, which include, I don't know, at last count, about 16 different types of behavior that could be construed as one or the other.  Okay, different types of behavior. Yes. That's what I meant by symptoms. Right. Okay. And what he's essentially saying, remember, we start, he claims there are three studies. This goes back to your first question, Judge Lynch. He claims there are three studies that somehow support his view of causation for or even association for ASD.  Let's be very careful about this. It's the association because it's the consistency of association, which is one very important step. Correct. In getting to the causation analysis. They don't say anything about causation in the studies. Correct. They don't. But as Judge Cote pointed out. And let's say I agree that two of them don't persuade me whatsoever, which are Gee and Liu.  That's why I was asking the question about what if there weren't any ASD studies, but the ADHD studies were fairly strong. What would we do then? I would suggest, Your Honor, that the third one, Avella-Garcia, is equally flawed. Again, because it is making its determination about an association based just on this scattershot of what's called a caste checklist. A checklist of 10 to 15 different symptoms. And that's not a credible way, according to Faccarelli himself. That's not credible. That's why he rejected TRANAS. So I actually think we don't have a single study that shows an association for ASD.  There are some associations. This may be my last question of the day. But it's a good place, for me at least, to stop asking questions, which is suppose I agreed with you about that. Suppose I agree with you that the analysis is insufficient to prove causation or to be a reliable indicator of causation with respect to ASD. This is a multidistrict litigation encompassing I don't know how many hundreds of cases. Hundreds is a fair number. Some of which are ASD cases. Some of which are ADHD cases. Does it follow, number one, that Dr. Faccarelli's report goes out, period, full stop? And even if that happens, even if it's not reliable because he doesn't purport in this study to do a Bradford Hill on just ADHD, Dr. Ness, and I hesitate to bring up a whole new case we're going to hear about next. Yes. But if there were an expert who had an ADHD analysis that does not suffer from those flaws, what do we do then? I would suggest, Your Honor, that if you were to affirm Judge Coates' finding with respect to the experts here on any of the three grounds, the transdiagnostic, the genetic confounding, or the, you know, the misrepresenting the consistency of the heterogeneous studies, the first appeal would be affirmed. But because Judge Coates allowed the plaintiffs to essentially re-up with a new expert to try to find a way to bring the ADHD cases forward, we would have to wait for the outcome of the second appeal. That would be the second case. Correct. We can't do anything about the first case. Although it's still sort of odd because, if I understand correctly, there are people who have ADHD in the first case, right? The second case is a different group of plaintiffs. Is that the story?  So if we were, and you're going to tell me where I'm going to, to decide that the plaintiffs win the second case, what happens to the people with ADHD who were caught up in the first MDL? Do they get a chance now to join the second one, or what? I don't know if they do. I mean, we're in an MDL. The people who are in the MDL pick their horse. They chose to use the transdiagnostic approach. And I just want to, if I'm going to... You have, well, on the next case, hopefully something related, and you can tie it in on that. Okay, I will. Thank you, Your Honors. Thank you. Thank you, Your Honors. Let me pick up where you left off, Judge Lynch. There is a study that I think is uncontroversial that shows a link between acetaminophen and autism, LEU 2016A, a 42% statistically significant increased risk for 20 days or more of exposure. I want to take a run at persuading you on G2020. If I can't persuade you to believe it all the way, at least you can believe that it's reliable. The G2020 authors themselves say that this is useful for the prenatal context. I could understand why that's counterintuitive at first, because it's just cord blood. But the G authors designed the study to try and determine whether the maternal recall studies, the questionnaire-based studies from previously, were understating, overstating, or about right in terms of the risk. They chose to extrapolate. So it may seem counterintuitive to say that you can extrapolate from the cord blood with the half-life that they are talking about, but that's what the G2020 authors themselves said. The problem I have with the LEU study is that it seems to me, as I read it, to say there is not a link between acetaminophen and what one might call pure ASD. There is a link to ADHD, and there is a link to ASD with hyperkinetic features. And that seems to me to say that factor X does not have a link to A. It does have a link to B, and it has a link to A plus B, which sure sounds like there's not much of a link to A. Now, but maybe it's not – I don't think you want to spend all your time on my problems with the LEU study, because I think from my vantage point, the question is who am I to be deciding this in the first place. I agree. That having been said, this is one of the errors I didn't quite get to from the district court, saying it the way you did, which is only a link between autism with hyperkinetic disorder. There is a finding in LEU 2016 of just autism, nothing else, 42 percent statistically significant increased risk. Let me talk about the Lau study from 2019. Dr. Baccarelli co-authored that study. He knows what it says. It was an IQ study. And he said he wasn't going to look at that symptom because it's not related to autism and ADHD. So he didn't just cover the waterfront and say, I'm going to look at all NDD studies. IQ is not linked to the disorders that he was considering. He looked at the study. He said what it said, but he didn't weight it in his Bradford Hill analysis. And what he weighted were ASD, ADHD, and symptom studies that were symptoms linked to one of those two. Correct. Studies like Brin-Lischuin, which didn't have a confirmed diagnosis but had the symptoms. Studies like Vlentary, which had the symptoms of these disorders. That's exactly what he did. It's completely reasonable for an expert to do. Let me talk very quickly about dose response and days of exposure. Ricci does not say anything negative about using days of exposure as a proxy. It does talk about genetic confounding as a reason to be concerned. And that's perfectly appropriate for the meta-analysis authors to say. There's not a single scientific authority that says you can't use days of exposure as a proxy for dose response. And dose response is one of the most important Bradford Hill factors. Some epidemiologists think it's the most compelling evidence of causation. Thank you. All right. Thank you very much. So we will take this case under advisement.